**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

I, Georgia Marshall, being duly sworn, hereby depose and state as follows:

INTRODUCTION

1. This affidavit is made in support of an application for a seizure warrant to seize a vehicle, to-wit; a 2012 Mercedes Benz c-class, West Virginia registration 67L918, VIN: WDDGF8BB9CR199047 (hereinafter "Target Vehicle") owned by Erica Kirker (hereinafter "KIRKER") and operated by Scott Midkiff (hereinafter "MIDKIFF"). The Target Vehicle is located at 347 6th Avenue, Huntington, West Virginia, where MIDKIFF often resides but is also frequently located at 1022 5th Street West, Huntington, West Virginia 25701, where KIRKER primary resides. Based on the facts set forth herein and this investigation, agents have developed probable cause that MIDKIFF, KIRKER, and others have been engaged in a continuous course of conduct involving the trafficking of various controlled substances, and that probable cause exists that evidence of violations of the following offenses: (i) the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841 (a)(1); (ii) conspiracy to commit and attempts to commit these offenses, in violation of 21 U.S.C. § 846; and (iii) use of a communications facility in facilitating

the commission of the foregoing offenses, in violation of 21 U.S.C. § 843(b), are currently located at that location, and establishes that the Target Vehicle represents the proceeds of certain unlawful activity, namely violations of Title 21, and was used to facilitate drug distribution activities. Thus, the Target Vehicle is subject to civil judicial forfeiture pursuant to 21 U.S.C. § 881, civil seizure pursuant to 18 U.S.C. § 981(b) by 21 U.S.C. § 881, criminal forfeiture pursuant to 21 U.S.C. § 853 and criminal seizure pursuant to 21 U.S.C. § 853(e)-(f) and Fed. R. Crim. P. 41.

2. I have been a Special Agent with the Federal Bureau of Investigation (hereinafter the "FBI") since 2019. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled substance investigations, white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I have been an Affiant on multiple federal search warrants and Title III affidavits. I am currently assigned to the Huntington, West Virginia Resident Agency of the Pittsburgh Division. Prior to my current assignment, I was a Special Agent with the Air Force Office of Special Investigations from 2015 to 2019 where I investigated federal offenses committed by Air Force members and/or offenses committed on Air Force installations. I have experience investigating complex drug trafficking organizations, firearm violations, and child exploitation, as well

as other violations of federal law. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3. The information contained herein is based on my knowledge, training, and experience, my direct involvement in this investigation, and upon information relayed to me by other law enforcement agents, and other witnesses. Because this Affidavit is being submitted for the limited purpose of seeking a seizure warrant for the Target Vehicle, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause.

## PROBABLE CAUSE

4. Investigators have determined that MIDKIFF, KIRKER, and others are involved in an extensive drug trafficking organization (hereinafter "DTO") and have committed, are committing, and will continue to commit the above referenced offenses.

5. During the course of this investigation, a confidential informant (hereinafter "CI#1"), who has provided corroborated information regarding drug trafficking in this district, conducted multiple consensually recorded telephone calls and made controlled drug purchases from MIDKIFF, KIRKER, and others. CI#1 conducted controlled purchases of methamphetamine from MIDKIFF for approximately three months and advised that MIDKIFF received large

amounts of methamphetamine from a supplier that CI#1 knew by the name "Broski," whom investigators identified as CHRISTOPHER VEST (hereinafter "VEST").

6. Investigators were also able to develop a separate confidential informant (hereinafter "CI#3"), who has provided corroborated information regarding drug trafficking in this district. CI#3 also conducted consensually recorded telephone calls and made controlled drug purchases from MIDKIFF and KIRKER. CI#3 stated that he/she believed MIDKIFF's methamphetamine supplier went by the name "Nick", whom investigators identified again as VEST.

7. From March to July 2021, investigators have monitored multiple TARGET TELEPHONES used by MIDKIFF, KIRKER, VEST, and others pursuant to wiretap orders authorized by United States District Judge Robert C. Chambers. In total, seven telephones used by the DTO have been monitored, including but not limited to, TARGET TELEPHONE #1 (a telephone used by MIDKIFF), TARGET TELEPHONE #2 (a telephone used by KIRKER), and TARGET TELEPHONES #3 and #4 (telephones used by VEST). Based upon the monitored calls, texts, and surveillance, investigators confirmed that MIDKIFF was receiving large quantities of drugs from VEST in Huntington. Through the interceptions, agents were able to determine VEST also supplies multiple other individuals, in addition to MIDKIFF and KIRKER, in the Huntington area.

8. On April 5, 2021, CI#3 informed agents that KIRKER had stored approximately $100,000 in cash, three to five pounds of methamphetamine, and 50 grams of heroin in a Range Rover which KIRKER parked near a parking garage on 3rd Avenue in Huntington, West Virginia. CI#3 also stated that KIRKER was going to return three pounds of methamphetamine to VEST, later that day and that KIRKER planned to move the contents of the vehicle into a storage locker later that day. On pole camera footage from the previous day, April 4, 2021, at approximately 10:33 AM, KIRKER was observed as she exited the front door of her former residence with a black rolling suitcase. KIRKER placed the suitcase in the Range Rover and departed west on 3rd Avenue. On April 5, 2021, investigators conducted a surreptitious warrantless search of the Range Rover that KIRKER was observed operating which was located on 3rd Avenue in Huntington. In the trunk area of the vehicle, investigators located a black suitcase containing approximately $84,380 in United States currency, approximately 1.2 pounds of a white substance that field tested positive for methamphetamine, approximately one-half pound of a gray substance that field tested positive for fentanyl, and approximately seven grams of a white substance that field tested positive for cocaine.

9. A check of the records maintained by the West Virginia Department of Motor Vehicles confirmed that the Target Vehicle is registered to KIRKER.

10. KIRKER purchased the Target Vehicle on January 14, 2020, from William E. Kitchens for $6,500.00. This was a private sale and no trade-in or loan was utilized. According to information obtained by financial analysts working on this investigation, KIRKER earned approximately $9,057 in the year 2020 and had no listed income thus far in the year 2021. SCOTT MIDKIFF did not have any listed income for the year 2020. To date, SCOTT MIDKIFF does not have any listed income for the year 2021.

11. Based on monitored calls and surveillance, KIRKER was primarily unemployed since the initiation of the case in October 2020. KIRKER recently started working at Firehouse Subs, but the Target Vehicle was obtained prior to KIRKER starting to work at that location. Throughout the duration of the investigation MIDKIFF has not been employed and spent approximately 70 days incarcerated. Additionally, on July 2, 2021, in a monitored call on TARGET TELEPHONE #4 (Session 1958) between VEST and KIRKER, KIRER told VEST that MIDKIFF's current employment at Legendary Cuts was false and that one of the workers was fabricating SCOTT MIDKIFF's employment there ("Yeah AD's you know made him a fake schedule and said that yeah he works for me and everything"). Thus, KIRKER and MIDKIFF have limited reported income and there is probable cause to believe that the Target Vehicle was purchased with proceeds generated by illegal drug distribution activities.

12. Moreover, KIRKER and MIDKIFF have both used the Target Vehicle to conduct and facilitate controlled substance transactions. As detailed below, investigators have conducted various forms of surveillance that has revealed that MIDKIFF and KIRKER utilize the Target Vehicle while engaged in drug trafficking activities and it is often parked in front of at MIDKIFF's residence at 347 6th Avenue, Huntington, West Virginia and sometimes at KIRKER's residence at 1022 5th Street West, Huntington, West Virginia. Prior to relocating to 1022 5th Street West, the vehicle was frequently parked at KIRKER and MIDKIFF's previous residence located at 1530 3rd Avenue, Apartment 1, Huntington, West Virginia.

13. On February 5, 2021, at approximately 4:23 PM, physical surveillance observed KIRKER open the trunk the Target Vehicle, which was parked behind 1530 3rd Avenue, Huntington, West Virginia. The Target Vehicle had no license plate at the time. At approximately 4:24 PM, KIRKER was observed between 1530 3rd Avenue and another building carrying something in her hand and walking back in 1530 3rd Avenue. During the debrief with CI#3, he/she provided that KIRKER went out to a car and came back inside with methamphetamine and provided him/her with approximately one ounce of methamphetamine. Based on my training and experience and the investigation thus far I believe KIRKER obtained a quantity of methamphetamine that was stored in the trunk of the Target Vehicle

and brought it back inside the residence to portion out one ounce of methamphetamine for CI#3.

14. On February 12, 2021, at approximately 4:00 PM, physical surveillance observed KIRKER opene the truck of the Target Vehicle, that was parked in the back of 1530 3rd Avenue, Huntington, West Virginia. Then KIRKER walked back toward the front of the residence and appeared to have something in her hand. At approximately 4:01 PM, KIRKER walked into the front door of the residence. KIRKER then provided CI#3 with approximately one ounce of methamphetamine. Based on my training and experience and the investigation thus far I believe KIRKER obtained a quantity of methamphetamine that was stored in the trunk of the Target Vehicle and brought it back inside the residence to portion out one ounce of methamphetamine for CI#3.

15. Based on the two physical surveillance incidents mentioned above, investigators believe that while MIDKIFF and KIRKER were residing at 1530 3rd Avenue, Apartment 1, Huntington, West Virginia, they used the Target Vechicel to store controlled substances, specifically methamphetamine.

16. On July 18, 2021, at approximately 1:25 PM (Session 2662), VEST on TARGET TELEPHONE #4 received an incoming call from MIDKIFF on TARGET TELEPHONE #1. The following was discussed;

      VEST:         Wassup?

      MIDKIFF:     Baby boy.

| | |
|---|---|
| VEST: | What's the deal my brother? I'm leaving the crib right now. Bitch had to the shower on, uh. Where you want me to meet you at, I'm about to leave and grab that shit now. You need both bro? |
| MIDKIFF: | Yeah, we might as well go ahead and do that. |
| VEST: | Alright, bet, then give me like 20-30 minutes, I'm about, I'm leaving the crib right now brother. |
| MIDKIFF: | Send me a number. |
| VEST: | Alright, I gotcha. |
| MIDKIFF: | For the last one. |
| VEST: | Alright. |
| MIDKIFF: | Alright, I love you. |
| VEST: | Love you too fool. |

17. Based on my training and experience and the investigation thus far I believe that after exchanging greetings, VEST told MIDKIFF that he was leaving his residence now and wanted to know where MIDKIFF wanted to meet to obtain methamphetamine and heroin from VEST ("What's the deal my brother? I'm leaving the crib right now. Bitch had to the shower on, uh. Where you want me to meet you at, I'm about to leave and grab that shit now. You need both bro?"). MIDKIFF responded in the affirmative ("Yeah, we might as well go ahead and do that.") and VEST replied that it would take approximately twenty to thirty minutes for him to be

ready with the controlled substances since he was leaving his residence now ("Alright, bet, then give me like 20-30 minutes, I'm about, I'm leaving the crib right now brother."). MIDKIFF asked VEST to let him know how much he owed VEST for previously obtained controlled substances ("Send me a number."). VEST replied in the affirmative ("Alright, I gotcha.") and MIDKIFF clarified it was for the previous controlled substance transaction ("For the last one."). VEST replied in the affirmative ("Alright.").

18. On July 18, 2021, the vehicle tracking device on VEST's Durango revealed VEST departed his residence, 2 Rujon Drive, Huntington, West Virginia, at approximately 1:29 PM. VEST drove directly to 1315 18th Street, Huntington, West Virginia and arrived at approximately 1:38 PM. VEST parked in the unnamed alley north of Williams Avenue between 17th Street and 18th Street in Huntington, West Virginia. At approximately 1:41 PM, the pole camera revealed VEST, in the Durango, was stopped at the intersection of the unnamed alley and 18th Street. VEST then traveled north on 18th Street and turned west on 12th Avenue. The above was confirmed via the vehicle tracking device on VEST's Durango.

19. On July 18, 2021, at approximately 1:43 PM (Session 2666), VEST on TARGET TELEPHONE #4 received an incoming call from MIDKIFF on TARGET TELEPHONE #1. The following was discussed;

    VEST:        Baby boy.

| | |
|---|---|
| MIDKIFF: | Baby boy. Uh, can you meet Erica at my, my new house? |
| VEST: | Yeah, yeah, I can, um, I'm actually coming that way. I'm about to stop by the bookie and shit. I'll be down there. |
| MIDKIFF: | Alright. |
| VEST: | Might actually comin' to y'all first. She down there right now? |
| MIDKIFF: | Uh, well, she's standing here with me, but she gotta go to the crib and get that for you. |
| VEST: | Okay, well shit, go ahead. Y'all go ahead and do what ya'll do, and just call me when you ready, I'm about to run to the bookie. I, I got it on me though, so shit. |
| MIDKIFF: | Alright, I'ma have her just go to the crib just whenever you're ready just go to the crib. |
| VEST: | Okay, bet. Alright. |
| MIDKIFF: | Alright, I love you brother. |
| VEST: | My brother, I love you too. |

20. Based on my training and experience and the investigation thus far I believe that after VEST greeted SCOTT MIDKIFF ("Baby boy.") MIDKIFF asked VEST to bring the controlled substances referenced in session 2662 to MIDKIFF's and KIRKER's new residence located at 1022 5th Street West, Huntington, West Virginia ("Baby boy. Uh, can you meet Erica at my, my new house?").

VEST replied in the affirmative and said that he would stop at 1022 5th Street West after stopping by his bookie's location ("Yeah, yeah, I can, um, I'm actually coming that way. I'm about to stop by the bookie and shit. I'll be down there."). MIDKIFF replied in the affirmative ("Alright."). VEST then said he was actually going to go to 1022 5th Street West to deliver the controlled substances prior to going to the bookies ("Might actually comin' to y'all first. She down there right now?"). MIDKIFF said that KIRKER was with him and she had to go to 1022 5th Street West to obtain payment for VEST ("Uh, well, she's standing here with me, but she gotta go to the crib and get that for you."). VEST replied that she can do that and he would just go to the bookie first then they could call him when they were ready, since VEST already had the controlled substances on him at that time ("Okay, well shit, go ahead. Y'all go ahead and do what ya'll do, and just call me when you ready, I'm about to run to the bookie. I, I got it on me though, so shit."). MIDKIFF replied in the affirmative and told VEST that KIRKER was going to their residence and whenever VEST was ready he could go to 1022 5th Street West ("Alright, I'ma have her just go to the crib just whenever you're ready just go to the crib."). VEST replied in the affirmative ("Okay, bet. Alright.").

21. On July 18th, 2021, the vehicle tracking device on VEST's Durango revealed VEST drove directly from 1315 18th Street to the

"bookie" located near the intersection of 11th Street and 6 and ½ Avenue Alley, Huntington, West Virginia. VEST arrived at approximately 1:46 PM. VEST departed the "bookie" at approximately 1:49 PM and drove to the Chase Bank located at 1000 5th Avenue, Huntington, West Virginia and arrived at approximately 1:50 PM. VEST departed the Chase Bank at approximately 1:52 PM and drove to 1022 5th Street West, Huntington, West Virginia. VEST arrived at 1022 5th Street West at approximately 2:02 PM and did not make any stops while driving from Chase Bank to 1022 5th Street West. Based on my training and experience, and the investigation thus far, I believe VEST, after he spoke with SCOTT MIDKIFF, departed his residence, went to 1315 18th Street where he stored heroin and methamphetamine. VEST then transported the heroin and methamphetamine in his Dodge Durango to 1022 5th Street West where he delivered the controlled substances to KIRKER.

22. As noted in the above, investigators have monitored numerous telephone lines used by members of the MIDKIFF/VEST/BYRD drug organization. These include telephones used by KIRKER and MIDKIFF. The calls between KIRKER and VEST, and MIDKIFF and VEST demonstrate that they have engaged in ongoing drug trafficking activity together for a significant period of time. Based on training and experience, I know that there is an obvious trust between MIKIFF, KIRKER and VEST developed over time and as a result of significant previous drug transactions.

23. The United States requests that the Court issue a seizure warrant as authorized under 18 U.S.C. § 981(b) by 21 U.S.C. § 881(b) as well as 21 U.S.C. § 853(e)-(f) because there is probable cause to believe that the Target Vehicle to be seized would, in the event of conviction, be subject to forfeiture, and an order under 21 U.S.C. § 853(e) and/or 18 U.S.C. § 983(j) may not be sufficient to assure the availability of the property for forfeiture as the Target Vehicle is easily moveable and transferrable property. The earlier paragraphs in the affidavit incorporated herein sets forth the reasons why an order under 21 U.S.C. § 853(e) and/or 18 U.S.C. § 983(j) may be inadequate.

24. Specifically, an order under 21 U.S.C. § 853(e) and/or 18 U.S.C. § 983(j) may not be sufficient to assure the availability of the Target Vehicle for forfeiture because there is reason to believe that the property is in the custody of KIRKER and SCOTT MIDKIFF, who cannot reasonably be relied on to abide by an order to maintain the property in substantially the same condition as it is at the present time in order that it will be available for forfeiture.

## CONCLUSION

25. The above-mentioned individuals have been engaged in near continuous drug activity since the beginning of the Title III wiretap investigation initiated on March 29, 2021. Due to the continuous nature of these subjects' drug dealing, their ongoing

course of conduct, and the above-stated information, probable cause exists that MIDKIFF, KIRKER, VEST, and others are engaged in drug trafficking activities including (i) the distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit and attempts to commit these offenses, in violation of 21 U.S.C. § 846; and (iii) use of a communications facility in facilitating the commission of the foregoing offenses, in violation of 21 U.S.C. § 843(b). Further, the above stated information established probable cause that the Target Vehicle, the 2012 Mercedes Benz c-class, West Virginia registration 67L918, VIN: WDDGF8BB9CR199047, registered in KIRKER's name, and primarily used by SCOTT MIDKIFF is subject to forfeiture by virtue of it representing the proceeds of drug trafficking offense and being used to facilitate illegal drug distribution activities.

Further your affiant sayeth naught.

_____
Georgia Marshall, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN before me by telephonic means, this 28th day of July 2021.

_____
CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE